

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00326-CV

———————————————

IN THE INTEREST OF E.M., A CHILD

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CP2020-0154

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

J.M. (Mother) appeals from the trial court's order terminating her parental rights to her son E.M. (Evan) and appointing the Department of Family and Protective Services (the Department) as Evan's permanent managing conservator.[1] In this ultra-accelerated appeal,[2] Mother raises three issues challenging the legal and factual sufficiency of the evidence supporting the trial court's two conduct findings and its best-interest finding. Because the evidence is sufficient to support one of the conduct findings and the best-interest finding, we will affirm the trial court's judgment.

## I. Background

### A. Evan's removal and placement

Evan was born in May 2017. In January 2020, Evan was living with Mother's parents—W.M. (Grandmother) and J.M. (Grandfather)—because Mother and E.T. (Father) were incarcerated. Because of Grandfather's admitted recent drug use and Grandmother's leaving Evan in Grandfather's sole care despite knowing about Grandfather's drug use, the Department removed Evan from the grandparents' home

---

[1]We refer to the child using an alias, to family members by their relationship to the child, and to family members' significant others by their initials. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

on January 17, 2020, and sued for conservatorship and to terminate Mother's and Father's parental rights. Soon thereafter, Evan tested positive for amphetamines, methamphetamines, cocaine, and marijuana.

Evan was initially placed in foster care, but in April 2020, he was placed with Mother's brother T.M. (Maternal Uncle) in Oklahoma where he remained until trial. At the time of trial, however, both Mother and Father wanted Evan placed with Father's brother D.T. (Paternal Uncle), who lives in Burkburnett, Texas, where Mother, Grandmother, and other family members live.

## B. The trial

The case was tried to the bench on October 1, 2021.[3] At the start of trial, the trial court took judicial notice of its file's contents without objection. The trial court heard testimony from various family members: Father; Mother; Grandmother; Paternal Uncle's girlfriend, S.T.; and Maternal Uncle's girlfriend, B.B. The caseworker

---

[3]On January 6, 2021, the trial court timely signed an order retaining the case on its docket, extending the case's dismissal date to July 17, 2021, and setting the case for trial on July 6, 2021. *See* Tex. Fam. Code Ann. § 263.401(a), (b). But instead of trying the case on July 6, 2021, the trial court signed an order retaining the case on its docket pursuant to the Texas Supreme Court's Thirty-Eighth Emergency Order Regarding the COVID-19 State of Disaster, which provided that in "any [termination] proceeding that, on the date of this Order, has been previously retained on the court's docket pursuant only to [Family Code] Section 263.401(b) or (b-1), the court may extend the dismissal date for a stated period ending no later than February 1, 2022." *See Thirty-Eighth Emergency Order Regarding the COVID-19 State of Disaster*, Misc. Docket No. 21-9060, ¶4.b (Tex. May 26, 2021). The trial court thus extended the dismissal date to February 1, 2022, and set the trial for October 1, 2021. *See id.*

and the Court-Appointed Special Advocate (CASA) supervisor for the case also testified.

**1.** *The Department's history with the family and Evan's removal*

The Department's removal of Evan in January 2020 was not the first time the Department had been involved with the family. Grandmother admitted that the Department was involved with her, Grandfather, and Mother in 2008 because of Grandmother's and Grandfather's drug use.[4]

Mother and Evan had been living with Grandmother and Grandfather since Evan's birth in May 2017. Mother testified that Grandmother had been Evan's primary caregiver for some time and that Evan referred to Grandmother as "mom" and "mommy." According to Mother, Grandmother took on that role because Mother had been diagnosed with congestive heart failure in 2018. While seeking treatment for that condition, Mother tested positive for methamphetamines. As a result, the Department became involved and prohibited Mother from staying overnight in the home.

Mother testified that on January 9, 2020, she was taken into custody for possession of one to four grams of a controlled substance. Mother left Evan with Grandmother and Grandfather. Mother claimed that she did not know that Evan was being exposed to drugs in the home even though she stated that she "took" the

---

[4]Mother would have been about 16 years old at the time.

controlled-substance charge for Grandfather.[5] About a week later, the Department removed Evan from the grandparents' home because it felt that Evan was in danger; shortly after Evan's removal, he tested positive for amphetamines, methamphetamines, cocaine, and marijuana.

As a result of the events leading to Evan's removal, Grandmother was charged with child endangerment and was on probation for that offense at the time of trial. But Grandmother claimed that she did not know that Grandfather was using drugs around the time Evan was removed, and she blamed Grandfather for creating the danger to Evan. Grandmother said that the danger had been eliminated because Grandfather had passed away. She also declared that she was drug-free.

### 2. *Mother's, Grandmother's, and Grandfather's drug-possession history*

Mother agreed that drug exposure is not healthy for a child and stated that it was "not possible" that Evan tested positive for drugs. But Mother testified that Grandfather had been convicted of possession of a controlled substance in 2014.[6] And Grandmother admitted what while Mother was living with her in 2016, Grandmother was convicted of possession of less than one gram of a controlled substance.

---

[5]Mother also claimed that she was charged because of her background.

[6]Mother initially said that Grandmother had also been convicted of possession in 2014, but she later stated that only Grandfather had.

Mother also had a history of drug possession. In 2014, she received a four-year sentence and served time in prison for possession of one to four grams of methamphetamines, and she pleaded guilty and received a probated 12-month sentence for a state-jail-felony drug-possession charge. On the drug-possession charge for which she was incarcerated when Evan was removed, Mother was sentenced to three years. She was released on November 18, 2020, and is on parole until December 2022.

**3.** *The Department's Service Plans*

Earvin Grubbs, a permanency case manager with 2INgage,[7] was assigned the case in August 2020. He testified that Mother's first service plan was filed with the trial court on March 13, 2020, and that an updated service plan was created in February 2021 that was "more tailored to [Mother] since she was [no longer] incarcerated." According to Grubbs, Mother was present when the updated plan was created, and when he reviewed it with her more than once, Mother understood the plan's requirements and did not ask Grubbs any questions. The updated plan was filed with the trial court on March 29, 2021.

---

[7]2INgage is a provider of community-based care that has contracted with the Department "to provide case management and foster care placement and support services for children in the foster care system" in parts of Texas, including Wichita County. *See* 2INgage, https://www.2ingage.org/about/ (last visited Mar. 16, 2022); *see also* Tex. Fam. Code Ann. §§ 264.151–.172 (describing and providing requirements for Department oversight of private community-based-care system for the State of Texas).

Grubbs testified that Mother did not complete the requirements of her court-ordered service plan. Mother was required to obtain and maintain a safe home environment, but she only partially complied with this requirement. She also participated in the required parenting classes, but according to Grubbs, Mother had not demonstrated that she understood Evan's needs because she "hasn't been able to understand the fact that he needs -- he needs her to be right there with him and be able to have that one-on-one connection," even though Mother understood how important consistency is with young children. Mother also did not comply with her plan's requirements in that she failed to consistently visit Evan; failed to inform Grubbs of how she planned to get Evan to and from school, medical appointments, and therapy sessions; failed to maintain and provide proof of employment; failed to provide proof of AA/NA meeting attendance; failed to submit to all drug-screen requests;[8] failed to test negative for illegal drugs; and failed to continue her substance-abuse classes after she was released from prison.[9] And although Mother participated in one substance-abuse assessment, she failed to participate in a second, which she was asked to do after she had a positive drug test.

Mother agreed that she had two service plans during the case: one that was prepared while she was in prison and one that was prepared after her release. Mother

---

[8]To Grubbs's knowledge, Mother failed to test five times.

[9]Mother did attend substance-abuse classes while she was in prison.

testified that she had completed some parenting and substance-abuse classes while she was incarcerated. She also testified that as part of her parole, she attended AA/NA meetings several times a week. But she admitted that she had failed to furnish Grubbs with proof of her attendance. She also admitted that she was currently unemployed. Although she had been employed periodically since her release from prison, she never furnished any paystubs to Grubbs to prove employment. She further admitted that she had failed to comply with her service plan. Specifically, she admitted that she had failed to complete individual counseling and psychological and psychiatric evaluations; she had missed phone visits with Evan; she had failed to consistently visit with Evan after her release from prison; she had failed to do a second substance-abuse assessment; and she had missed several drug tests.

### 4. *Mother's continued drug use and ongoing legal issues*

Mother's drug use and her legal issues continued throughout the case. Mother claimed that she had submitted to random drug tests "[t]o [the] best of [her] ability," if she "knew about [them]" and could "make it." But she admitted to missing several requested drug tests[10] and confessed to testing positive for methamphetamines in

---

[10]Under the trial court's temporary order, the Department considered the following as equivalent to a positive drug test: refusal to submit to a test and failure to appear for or submit to a requested test.

Mother claimed that she was unable to take a requested nailbed test because her nails were too short. She explained that she "didn't think they were short at all [be]cause I don't cut my nails" and that her heart medication "do[es]n't allow your nails to grow." She also could not take a requested hair-follicle test because she had

8

February or March 2021. She also admitted that she had last used methamphetamines around the time of her father's death in June or July 2021.[11]

Mother also had ongoing legal issues during the termination case. In addition to being on parole until December 2022, Mother was on probation for a 2019 federal misdemeanor offense in Oklahoma. An arrest warrant had been issued in that matter, and Mother spent about 13 days in jail in Comanche County, Oklahoma, in September 2021. She also mentioned being on "house arrest" in August 2021.

### 5. *Mother's bond with Evan*

According to Grandmother, Mother had a bond with Evan "when he was small," but Mother's time in prison had weakened that bond. Paternal Uncle's girlfriend, S.T., confirmed that Grandmother had raised Evan. S.T. testified that while Mother loves Evan, Mother never "learned to be a mom" to him and that Mother "has not had that relationship [with Evan] and now he's four and they just don't have that bond."

Throughout the case, Mother showed little interest in bonding with Evan. Notably, she had not seen Evan in person since January 2020. According to Grubbs, Mother's service plan required weekly visits, but Mother's visitation had been

___

just gotten her hair done in a manner that made retrieving a hair sample impossible, but she could not explain why she would style her hair that way when she had agreed to submit to a hair-follicle test. She also explained that she had missed one uranalysis request because she was at a medical appointment.

[11]Grandmother testified that Grandfather passed away in July 2021.

suspended multiple times because she had missed more than two consecutive visits. Grubbs reported that out of 20 possible in-person visits, Mother had attended none and that out of the 88 FaceTime or telephone visits with Evan that Mother had been allowed after she was released from prison in November 2020, Mother was late to or missed 55. Grubbs further testified that young children start to forget people that they don't see frequently and that based on Mother's missed visits, it was possible that Evan might forget Mother.

Mother admitted that her service plan required her to regularly visit with Evan. She further admitted that she had attended no in-person visits but claimed that her lack of attendance was because she was on parole and because of the distance she needed to travel to visit Evan. Mother conceded, however, that she had reliable transportation and that her parole terms did not prevent her from visiting Evan; she just needed to "plan [it] out" and ask permission from her parole officer, who would have to get it approved. But Mother had asked for permission only once, and according to her, "circumstances" and going "on house arrest" had prevented her from trying again.

Mother also admitted that she had missed virtual and telephone visits with Evan and that these visits, which were currently scheduled for Tuesdays and Sundays, had been suspended (perhaps more than once) because she had missed them. She attributed these missed visits to her oversleeping and to her being in jail. But Mother

claimed that she had attended more visits than she had missed. She testified that she last visited with Evan about a month before trial.

Maternal Uncle's girlfriend, B.B., testified that Evan had been placed with her and Maternal Uncle since April 2020. She agreed that Mother had not visited Evan in person. B.B. testified that on one occasion, Mother had claimed to have her parole officer's permission to visit Evan, but on the morning of the scheduled visit, Mother cancelled because she claimed it had not been approved after all. Mother had made no other attempts to visit Evan in person.

Regarding virtual visits, B.B. testified that those visits were scheduled on Tuesdays and Sundays at Mother's request but that Mother had missed some scheduled visits and was habitually late for others. As a result, the trial court implemented a 15-minute grace period for Mother to call. If Mother did not call within that time, she had to wait for the next scheduled visit.

**6.** *Evan's current placement*

Since April 2020, Evan had been living with Maternal Uncle and his longtime girlfriend, B.B. Before that, Evan had been in foster care. Shana Berube, the CASA supervisor for Evan's case, testified that when then-two-and-half-year-old Evan was placed into foster care in January 2020, he had motor-skill and speech delays.

When Berube was asked to elaborate on her concerns regarding Evan's motor skills, she explained,

11

one instance in particular I observed him trying to feed himself. He struggled to pick up the spoon, to actually use it, and then struggled [to] get the food from the spoon to his mouth. And when it fell onto his lap it was like you were watching him in slow motion. He really had to process what the next step was to get that food off his lap and into his mouth.

Regarding Evan's speech delay, Berube testified that Evan "was almost nonverbal. There were concerns of possible autism with the lack of speech. He did not really communicate with any other children in the home and did not communicate well with the foster parents when he first came into care." Berube said that Evan was unable to communicate with her and that "[h]e made a lot of more, like, grunting noises, more sounds versus words." Berube explained that Evan "had very minimal words" and a limited vocabulary for a child his age. She further explained that Evan's speech delays were not the result of being placed in the Department's care nor were they simply issues with pronouncing the letter R, as S.T. had testified.[12]

Berube testified that Evan was moved from foster care to Maternal Uncle and B.B.'s home after they had appeared at an adversary hearing in the case and requested that Evan be placed with them. After a home study was completed, Evan was placed with them in Oklahoma. Since then, Berube had monthly FaceTime visits with Evan and had one in-person visit in Oklahoma in May 2021. When asked if she had observed any changes in Evan's speech, Berube replied, "Yes. His speech had done essentially a complete 180. He was able to form sentences and communicate with me

---

[12]S.T. also claimed that Evan taught her daughter, who is Evan's age, to talk.

when I spoke to him and answered questions. It was much different than my initial visit with him." She testified that B.B. had Evan evaluated, that Evan had successfully completed speech therapy, and that his school was "going to allow him to continue doing speech at . . . school to kind of keep improving on the skills that he's already developed." Berube also reported that Evan's motor skills had "vastly improved."

According to Berube, Evan had adjusted well to his current placement, had a safe and stable home with Maternal Uncle and B.B., and was bonded with them. In Berube's words, Evan has a "very strong attachment" to Maternal Uncle and B.B., and they are "a safe, secure[,] and permanent placement option for [him]." Berube admitted that she had not personally seen Evan with Maternal Uncle, but based on her personal observations of Evan's interactions with B.B., Evan and B.B. were bonded. It was Berube's understanding that Maternal Uncle and B.B. were in a long-term relationship and were engaged.

Berube understood that Maternal Uncle and B.B. intended to adopt Evan if Mother's and Father's parental rights were terminated. Berube stated that she believed that termination was in Evan's best interest and that it was CASA's recommendation that Maternal Uncle and B.B. be allowed to adopt Evan.

### 7. *The Department's plan for Evan*

Grubbs testified that the Department's plan for Evan was adoption by Maternal Uncle, who wants to adopt him; there were no other adoption possibilities for Evan. Grubbs stated that in Maternal Uncle and B.B.'s care, Evan's speech had

improved, he attends daycare, and he plays sports. Grubbs believes that Maternal Uncle and B.B. have provided Evan with consistency, which Mother had been unable to provide.

Evan calls B.B. "mom," and she is Evan's primary caretaker because Maternal Uncle is a long-haul truck driver. According to Grandmother, if B.B. left Maternal Uncle, he would be unable to take care of Evan. Along those lines, Berube testified that because Maternal Uncle and B.B. were unmarried, only Maternal Uncle would be allowed to adopt Evan. And she acknowledged that if something happened to Maternal Uncle, B.B. would have no rights to Evan and that in that situation, Evan would have to be moved. Conversely, without B.B., Maternal Uncle would be unable to care for Evan without support. And to Berube's knowledge, Maternal Uncle's family was in the Burkburnett and Wichita Falls areas, but B.B's family was in Oklahoma.

B.B. testified that she had been in a relationship with Maternal Uncle for 11 years. And although they planned to get married soon, adopting Evan was not the reason they were getting married. B.B. agreed with Berube's concerns regarding Evan when he was placed in her and Maternal Uncle's home in April 2020. B.B. agreed that she had seen the same dramatic improvements in Evan's speech and motor skills that Berube had described. B.B. confirmed that Evan had graduated from speech therapy and was continuing to receive speech therapy at school.

B.B. testified that she and Maternal Uncle love Evan and that Evan is bonded with them. She believed that it was in Evan's best interest to remain with her and Maternal Uncle. She also believed that termination of Mother's and Father's parental rights was in Evan's best interest because Evan "needs consistency[,] and he needs to know that he is always coming back to where he is now. He has attachment issues so he's always afraid that he's not gonna come back."

### 8. *Mother's plans for Evan*

Mother loves Evan and wanted him returned to her; she also wanted more time to complete her service plan because she had been incarcerated for ten months of the over-20-month-long case. She admitted that she was not perfect and had made mistakes but claimed that she was growing and learning how to be a mother. Even so, Mother had been unable to show that she had secured appropriate housing, prove that she had maintained employment, or establish that she fully understands Evan's needs.

Mother is currently living in what she described as a "little duplex" on the same lot as Grandmother's house. But Mother acknowledged that Grubbs had informed her that this housing situation was inappropriate because the Department wanted Mother away from Grandmother's home. Grandmother had purchased a home for Mother, but it was still in the process of being renovated. Mother had tried securing other housing but had been unsuccessful.

Mother had also been unsuccessful at maintaining employment. She was unemployed at the time of trial and claimed to have had four jobs since her release from prison, even though she never provided any paystubs to Grubbs or told him that she was employed. She was fired from one job; she had to quit another in Randlett, Oklahoma, because working out of state was a parole violation; and she left the others to get better jobs that paid more. Even so, Mother considered her employment stable.

Mother said that she has access to five vehicles with child-safety seats that she could use to transport Evan to school and to his medical and therapy appointments. She knew that Evan was currently in speech therapy but denied knowing before his removal that Evan's speech and motor-skill development was delayed, even though she had lived with Evan and had gone with Grandmother to his medical appointments. And because Grandmother was Evan's primary caregiver before Mother went to prison, Mother acknowledged that she did not know the names of Evan's pediatrician or his dentist, even though she claimed to have gone to Evan's medical and dental appointments.

### 9. *Mother's and Father's proposed placement*

Mother had initially requested that Evan be placed with Maternal Uncle. At trial, however, Father,[13] Mother, Grandmother, and S.T. testified that they believed it

_____

[13]At the time of trial, Father was incarcerated for his May 2018 convictions for aggravated robbery, evading arrest, theft of a firearm, and drug possession. He had

would be better for Evan to be placed with Paternal Uncle, who lived in Burkburnett, so that Evan could be closer to family, most of whom lived in the Burkburnett and Wichita Falls areas. They were concerned that if Mother's parental rights were terminated and Evan remained with Maternal Uncle and B.B. in Oklahoma, they would lose contact with him. S.T. was especially concerned that terminating Mother's parental rights would effectively take Evan away from Grandmother, who was "the best mom to that baby."

But as Father acknowledged during this testimony, Paternal Uncle has a criminal record. Grubbs reported that a home study was completed on Paternal Uncle in July 2021 but that it was denied because Paternal Uncle has a criminal history, specifically multiple DUIs. Grubbs and Berube both agreed that uprooting and placing Evan with Paternal Uncle would not be in Evan's best interest because Evan had been with Maternal Uncle for over a year and had experienced growth and stability with him and B.B. It was Berube's opinion that Evan was very attached to Maternal Uncle and B.B. and that "due to his past developmental delays it could be potentially harmful to remove him and put him into a new situation where he's having to adapt all over again."

---

been in custody since his arrest for these offenses in August 2017. According to him, his projected release date is in August 2027, but he will be eligible for parole in August 2022.

When B.B. was questioned about concerns that Evan would lose contact with his family in Texas, she testified that she and Maternal Uncle have older children that live in Burkburnett and that they try to attend their sporting events there. B.B. stated that at the beginning of the case, the trial-court judge had ordered that Evan was not to have contact with the grandparents until Mother was released from prison. Grandmother stated that she had been able to video chat with Evan since Mother's release from prison.

B.B. further testified that S.T.—who has a child Evan's age with whom Evan was very close before removal—had reached out to B.B. at the beginning of the case about the two children maintaining contact, but B.B. had not heard from her since. And neither Father's family nor Paternal Uncle had contacted her about maintaining contact with Evan, but if Paternal Uncle had, B.B. would have made an effort to facilitate that contact, provided that such contact was approved. Additionally, B.B. stated that she facilitates FaceTime conversations with Evan's half-brother every Wednesday. And had she known about Evan's other half-siblings (Father discussed them during his testimony), she would have facilitated contact with them, too.

**10.** *The trial court's ruling*

At the trial's conclusion, the trial court terminated Mother's and Father's parental rights and appointed the Department as Evan's permanent managing conservator. As to Mother, the trial court found by clear and convincing evidence that termination of Mother's parental rights to Evan was in the child's best interest and

18

that the Department had established by clear and convincing evidence the conduct grounds under Subsections (N) (constructive abandonment) and (O) (failure to comply with court order).[14] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N), (O), (b)(2). The trial court also found that Mother had failed to prove by a preponderance of the evidence that she was unable to comply with specific provisions of a court order and that despite making a good-faith effort to comply with that order, her failure to comply was not her fault. *See id.* § 161.001(d). The trial court thus terminated Mother's parental rights to Evan and appointed the Department as Evan's permanent managing conservator.

Mother timely appealed and, in three issues, challenges the legal and factual sufficiency of the evidence supporting the trial court's conduct and best-interest findings.

## II. Burden of Proof and Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and 2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or

---

[14]Because Father has not appealed the termination of his parental rights, we do not detail the trial court's findings against him.

conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the parent violated a predicate ground listed in Section 161.001(b)(1) and that termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the

parent violated a predicate ground listed in Section 161.001(b)(1) and that termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### III. Mother's Failure to Comply with a Court Order Specifically Establishing the Actions Necessary for Evan's Return

In her second issue, Mother attacks the sufficiency of the evidence supporting the trial court's finding under Subsection (O), which permits a trial court to terminate a parent–child relationship if the parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(b)(1)(O).

On appeal, Mother does not dispute that she failed to comply with her service plans, and she admitted as much at trial.[15] Nor does she complain that the service plans' terms did not specifically establish the actions necessary for her to obtain

---

[15]Mother also admitted at trial that she had two service plans, one of which was prepared while she was incarcerated and the other after she was released. Grubbs testified that Mother had two court-ordered plans.

Evan's return.[16] Instead, she argues that the evidence was legally and factually insufficient to support the trial court's Subsection (O) finding because (1) there was no "court order that specifically established the actions necessary for [her] to obtain the return of [Evan]," *id.*, and (2) any such court order was not offered into evidence at trial.

Regarding Mother's second argument, she asserts that no service plan or court order establishing the actions necessary for her to obtain Evan's return was offered into evidence at trial. Although the Department did not offer Mother's service plans or any of the trial court's orders into evidence, the trial court took judicial notice of the contents of its file—which includes the two plans discussed during trial, the status-hearing order, and the permanency-hearing orders—and no party objected. We may thus consider those filings in our sufficiency analysis. *See, e.g.*, *In re M.C.*, No. 02-15-00290-CV, 2016 WL 354186, at *2–3 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.) (holding that a trial court's judicial notice of its file makes an order described by Subsection (O) "part of the record that we may consider on appeal for purposes of [a parent's] sufficiency argument" and listing similar cases from other appellate courts holding same).

---

[16]In Mother's brief, she states in a single sentence and without argument or citation to the record that "[t]his Court must determine whether the court order was sufficiently specific, setting forth Mother's terms for compliance with certainty." To the extent that Mother is making a lack-of-specificity argument, we conclude that it has been inadequately briefed. *See* Tex. R. App. P. 38.1(i).

In support of her lack-of-court-order argument, Mother complains that neither the March 13, 2020 service plan nor the March 29, 2021 updated service plan was a court order because the plans were merely filed with the trial court. *See In re M.G.*, No. 07-19-00289-CV, 2020 WL 611554, at *5 (Tex. App.—Amarillo Feb. 7, 2020, no pet.) (mem. op.) ("[T]o support a termination order based on [S]ection 161.001(b)(1)(O), there must be a court order rather than simply a Department-generated service plan."). Regarding the March 13, 2020 service plan, Mother points to the following language in the trial court's March 26, 2020 "Status Hearing Order" and to similar language in the trial court's five subsequent permanency-hearing orders:

> IT IS ORDERED that, except as specifically modified by this order or any subsequent order, the plan of service for [Mother] filed with the Court on **March 16, 2020** or attached to this order and incorporated herein by reference as if the same were copied verbatim in this order, is **APPROVED** and made an **ORDER** of this Court.

Mother asserts that because no service plan was filed on March 16, 2020, there was no court order specifically establishing the actions necessary for Mother to obtain Evan's return.

This argument—as well as Mother's contention that the March 29, 2021 updated service plan was never made an order of the trial court—ignores the following two provisions in the trial court's February 14, 2020 "Temporary Orders Following Adversary Hearing":

- Under the heading "Additional Orders for All Parties," "**[Mother] and [Father]** are **ORDERED**, pursuant to § 263.106 Texas Family Code, to

23

comply with each requirement set out in the Department's Original, or any amended, service plan during the pendency of this suit;" and

- Under heading "Compliance with Service Plan": "**[Mother]** is **ORDERED**, pursuant to § 263.106 Texas Family Code, to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit."

Additionally, the temporary orders themselves set out the following specific requirements necessary for Mother to obtain Evan's return and warned that failure to comply could result in the termination of her parental rights: submitting to a substance-abuse assessment; completing substance-abuse treatment; submitting to drug testing; submitting to psychological and psychiatric evaluations; attending counseling; and maintaining employment. Accordingly, we conclude that the evidence is legally and factually sufficient to satisfy Subsection (O)'s court-order requirement,[17] and we thus conclude and hold that the evidence is legally and factually sufficient to support the trial court's Subsection (O) finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O); *In re J.B.*, No. 02-18-00173-CV, 2018 WL 4626427, at *3–5 (Tex. App.—Fort Worth Sept. 27, 2018, no pet.) (per curiam) (mem. op.). We overrule Mother's second issue.

---

[17]Moreover, as the Department points out, "[i]t would be ridiculous to assume that the March 16, 2020 reference in each hearing order is anything more than a clerical error," especially since one of the purposes of the status and permanency hearings is to review the service plan and the parent's progress on the plan. *See generally* Tex. Fam. Code Ann. §§ 263.001–.307.

## IV. Evan's Best Interest

Mother's third issue challenges the sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in Evan's best interest.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

As to the child's desires, Evan did not testify and at four years old is arguably too young to express his desires. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see In re M.R.*, No. 02-19-00212-CV, 2019 WL 6606167, at *8 (Tex. App.—Fort Worth Dec. 5, 2019, no pet.) (mem. op.) (stating that because of child's infancy, the factfinder could consider the child's bond with her foster family in lieu of the child's desires). These considerations are also relevant to the factors regarding the Department's plan for Evan and the stability of the proposed placement. *See M.R.*, 2019 WL 6606167, at *8.

26

Here, Evan has lived with Maternal Uncle and B.B. since April 2020, is bonded with them, and calls B.B. "mom." Evan has experienced growth and stability in their care. Grubbs believed that Maternal Uncle and B.B. have provided Evan with consistency, which, according to Grubbs, Mother has been unable to provide. In contrast, Mother lacked a bond with Evan. Both Grandmother and S.T. testified that Grandmother acted as Evan's mother before his removal. And during the case, Mother seemed unwilling to work to establish a maternal bond with Evan. Specifically, she hadn't seen Evan in person since January 2020, and she made only one attempt at an in-person visit after she was released from prison in November 2020. And her virtual visits since then have been inconsistent.

The Department's plan for Evan—adoption by Maternal Uncle and B.B.—was also recommended by CASA. And although Maternal Uncle and B.B. were unmarried at the time of trial and lived in Oklahoma, B.B. testified that she and Maternal Uncle planned to marry soon and indicated that Evan would maintain contact with his family in Texas. We conclude that these three factors weigh in favor of the trial court's best-interest finding.

Regarding Evan's physical and emotional needs now and in the future and the physical and emotional danger to Evan now and in the future, Maternal Uncle and B.B. were providing Evan with a stable home, maintaining his speech-therapy classes, and had him enrolled in daycare and sports. Mother, however, had not recognized Evan's delayed speech and motor-skill development, had relied on Grandmother to

parent Evan, had no bond with Evan, and could not name Evan's pediatrician and dentist. Moreover, Mother struggled to maintain employment, was unemployed at the time of trial, had lingering legal issues that led to her incarceration and house arrest during the case, and had continued to use drugs as evidenced by her positive drug tests and admitted drug use. These facts are also relevant to Mother's parenting abilities as well as to acts and omissions indicating that the existing parent–child relationship is not a proper one. These factors also weigh in favor of the trial court's best-interest finding.

Regarding the stability of Mother's home and Mother's plans for Evan, both Mother and Grandmother testified that Mother lived in a duplex on the same lot as Grandmother's home. Grubbs testified that Mother's home had adequate working utilities, furnishings, plenty of food, and toys for Evan. Mother planned to live with Evan there, even though Grandmother was currently on probation for child endangerment. Mother claimed that she was ready to be Evan's mother and explained how she planned to transport Evan to school and to his medical and therapy appointments. But, as noted, Mother continued to struggle with drugs, employment, and legal issues, all of which undermine the stability of Mother's home and her plans for Evan. We conclude that, on balance, these factors weigh in favor of the trial court's best-interest findings.

Regarding the programs available to assist Mother in promoting Evan's best interest, Mother completed parenting classes and some substance-abuse classes but

she failed to complete other aspects of her service plan, like continuing with her substance-abuse classes, that would have helped her to be a better parent to Evan. This factor weighs in favor of the trial court's best-interest finding. *See M.R.*, 2019 WL 6606167, at *9 ("A parent's noncompliance with a service plan may be considered as evidence in favor of termination in the child's best interest.").

Viewing the evidence under the appropriate standards of review and considering the *Holley* factors, we conclude and hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Holley*, 544 S.W.2d at 371–72. We overrule Mother's third issue.

## V. Mother's Remaining Issue

Mother's first issue challenges the sufficiency of the evidence supporting the trial court's Subsection (N) finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N). We do not reach this issue because a finding of only one ground alleged under Section 161.001(b)(1) coupled with a best-interest finding under Section 161.001(b)(2) is sufficient to support a termination judgment. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *J.B.*, 2018 WL 4626427, at *7; *see also* Tex. R. App. P. 47.1.

## VI. Conclusion

Having overruled Mother's first and third issues, we affirm the trial court's judgment terminating Mother's parental rights to Evan.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  March 24, 2022